**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHARLES HERBERT PROCTOR, III ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | |
| Plaintiff, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| DEUTSCHE BANK SECURITIES INC., DEUTSCHE BANK AG, and JOHN DOES 1-50, | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. | |

Plaintiff Charles Herbert Proctor, III ("Plaintiff"), individually and on behalf of himself and all those similarly situated, as defined below, brings this class action for damages and alleges as follows:

## NATURE OF THE ACTION

1. This action arises from Defendants' unlawful and intentional manipulation of U.S. Treasury Futures contracts ("Treasury Futures") and Eurodollar Futures contracts ("Eurodollar Futures") that trade on United States-based exchanges, including the Chicago Mercantile Exchange ("CME") and its subsidiary the Chicago Board of Trade ("CBOT"), during the period at least January 1, 2013 to December 31, 2013 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and the common law.

2. Defendants manipulated the prices of Treasury and Eurodollar Futures by employing a classic manipulative device known as "spoofing," whereby Defendants placed orders for Treasury and Eurodollar Futures to send false and illegitimate supply and demand signals to these markets and then canceled those orders before execution. As a result, Defendants caused Treasury and Eurodollar Futures prices to be artificial throughout the Class Period to financially benefit their trading positions at the expense of other investors, like Plaintiff and the Class.

3. Defendants repeated the scheme throughout the Class Period and successfully manipulated Treasury and Eurodollar Futures prices to artificial levels throughout the Class Period.

4. The unlawful conduct and manipulation described herein is the subject of a Commodity Futures Trading Commission ("CFTC") Order released on June 18, 2020, *In re* Deutsche Bank Sec. Inc., CFTC No. 20-17 (June 18, 2020) (hereinafter "CFTC Order"), in which the CFTC fined Defendant Deutsche Bank Securities Inc. $1.25 million. In the CFTC Order, Deutsche Bank Securities agreed to cease and desist from spoofing.

5.     This is not the first time Defendants have used spoofing to manipulate futures prices.  On January 29, 2018, the CFTC fined Defendants $30 million for spoofing precious metals futures. *See In re* Deutsche Bank AG and Deutsche Bank Sec. Inc., CFTC No. 18-06 (Jan. 29, 2018).

6.     Plaintiff's allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiff, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning the Treasury and Eurodollar market, which Plaintiff (through its counsel) obtained from, among other sources:  (1) reports about the Treasury market and Eurodollar market; (2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Treasury and Eurodollar Futures, among others; (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the CFTC; and (4) and other public reports about Defendants.

7.     Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

9.     Venue is proper in the Northern District of Illinois, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the Defendants resided,

transacted business, were found, or had agents in the District.  Indeed, Chicago, Illinois is the global center of futures and options trading, a major hub of the Treasury trading activity at issue in this litigation, and the location of key witnesses and documents.  In particular, the Northern District of Illinois is home to the Chicago Board of Trade and CME Group Inc., which host the Treasury and Eurodollar Futures and Options trading at issue in this litigation.  For example, CME, the exchange through which the alleged manipulation occurred, is in Chicago, Illinois, and the electronic trading system, through which the trades at issue were made, utilizes servers located in Chicago, Illinois.  As such, a significant part of the events giving rise to the claims occurred in the Northern District of Illinois.

10.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged in this Complaint.  Treasury and Eurodollar Futures are commodities that trade in interstate commerce in the United States.

## THE PARTIES

### I.     Plaintiff

11.     Plaintiff Charles Herbert Proctor, III ("Proctor") was at all relevant times a Michigan resident and transacted in Treasury Futures during the Class Period, including purchases and sales of futures on the CBOT.  Plaintiff Proctor transacted in Treasury Futures contracts and options on those contracts during the Class Period and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for Treasury Futures throughout the Class Period, which deprived Plaintiff Proctor and the Class of the ability to transact in a lawful market that was free of manipulation.

3

## II.    Defendants

12.    Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  Defendant Deutsche Bank AG is licensed by the New York Department of Financial Services with a registered address at 60 Wall Street, New York, New York 10005-2858.

13.    Defendant Deutsche Bank Securities Inc. is a Delaware corporation with principal place of business in New York, New York.  Deutsche Bank Securities Inc. is an indirect wholly-owned subsidiary of Deutsche Bank AG and is registered as a broker-dealer with the SEC and as a futures commission merchant with the CFTC.  Deutsche Bank Securities Inc. is a clearing member of the CME.

14.    Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. are referenced collectively in this Complaint as "Deutsche Bank."

15.    Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Treasury and Eurodollar Futures.  The defined term "Defendants" also includes John Doe Defendants.

16.    During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Treasury and Eurodollar Futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit.  The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

17.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents

4

while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

18.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.     Relevant Factual Background**

**A.     Overview of Key Terms**

19.     **Commodity Futures Contract.**  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.  Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

20.     **"Long" and "Short" Futures.**  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  Treasury Futures are deliverable upon expiry; Eurodollar Futures are cash settled.  However, futures contracts can also be offset before expiration.

21.     **Offset by Trading.**  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a

purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

22. **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Treasury and Eurodollar Futures).

23. **Call option.** A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit. The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

24. **Put options.** A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease

so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

**B.    The CME Group**

25.    The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges. Its global headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606. In 2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a DCM offering products subject to CBOT rules and regulations. CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering. Today, the CME Group is made up of four exchanges, CME, CBOT, NYMEX, and COMEX. Each exchange offers a wide range of global benchmarks across major asset classes.

26.    The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts. Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day. CME Globex is also subject to CME rules including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading. The platform is based in and utilizes computer servers in Chicago and Aurora, Illinois.

27.    CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels." An "order" is a request to buy (a "bid") or sell (an "offer" or "ask"). The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid

level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between these two prices.

28.　　Quotes to buy or sell are entered into the Order Book, which allows market participants to see the number of orders and the total number of contracts that all traders are actively bidding or offering at a given price level.  The identities of traders who submit quotes into the Order Book are anonymous.  Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

29.　　Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels.  This combined bid and ask information is often referred to as the visible order book and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1).  Traders use the information contained in the order book to make trading decisions.



FIGURE 1.

30.     An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*, the order is placed at a price where another trader is already willing to transact. Practically speaking, an aggressive buy order would be placed at the first-offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower. Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

31.     By contrast, a "passive order" does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. A passive sell order would be placed at the best-bid offer price or higher. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

32.     CME Globex bids and offers for outright futures are matched according to an algorithm known as "FIFO," which stands for first-in, first-out.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.  Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity.  The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed.  In addition, futures contract spreads are matched based on an algorithm that takes into account the size of the orders among other criteria, with orders filled on a pro rata basis depending upon, among other things the size of the order, and with larger orders receiving a larger pro rata share, all else being equal.

### C.     Overview of Treasury and Eurodollar Futures

33.     **U.S. Treasury Securities.**  To raise capital to operate the federal government and finance the public debt, the U.S. Treasury sells marketable securities in the form of bills, notes, and bonds to institutional and individual investors through investment companies and banks at public auctions.  This debt is subject to fixed terms, *e.g.*, 2-year, 5-year, 10-year, and 30-year terms at fixed interest rates determined by the prevailing interest rates in the marketplace at the time of issuance of the bonds.  Strictly speaking, U.S. Treasury bonds have original maturities of greater than 10 years at time of issuance, and U.S. Treasury notes ("T-Note") have maturities ranging from 2-years to 10-years (2, 3, 5, 7 and 10 years).  Treasury bills, notes, and bonds are referred to as marketable securities because after they are sold in auctions, they are generally bought and sold in

the secondary market at prevailing prices from dealers in government securities. Many instruments bought and sold by market participants are linked to Treasury yields/prices.

34. **Treasury Futures.** Treasury Futures are deliverable baskets of U.S. treasuries, fixed-income securities issued and backed by the U.S. government to finance debt.[1] Treasury Futures provide market participants with the ability to manage their interest rate exposure. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future. Treasury Futures provide easy access to leverage and both capital and operational efficiencies, which benefit market participants—such as asset managers, banks, corporate treasurers, hedge funds, insurance companies, mortgage bankers, pension funds, primary dealers, and proprietary traders—for purposes of hedging and assuming risk exposures. In addition, Treasury Futures offer market participants the added security of reduced counterparty risk, insofar as CME faces every trade as its counterparty.

35. Since the first Treasury Futures products were launched over 40 years ago, CBOT Treasury Futures have become one of the CME's core interest rate products. Presently, Treasury Futures primarily trade through CME Globex, though certain option contracts remain traded through open outcry. U.S. Treasury and currently traded on the CME include: (i) 2-year T-Note Futures; (iii) 5-year T-Note Futures; (iii) 10-year T-Note Futures; (iv) U.S. Treasury Bond futures (v) Ultra 10-year T-Note Futures; and (vi) Ultra US Treasury Bond Futures. Options are available on U.S. Treasury Futures contracts. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.

---

[1] As set forth above, references to Treasury Futures are to CBOT Treasury Futures and Options contracts, unless otherwise noted.

According to the CME, in February 2020, the average daily volume was 4.4 million Treasury Futures contracts and nearly 1 million Treasury Options contracts.

36.     **Eurodollars**.  Eurodollars are U.S. dollars deposited in commercial banks outside the United States.[2]

37.     **Eurodollar Futures**.  CME Eurodollar futures have reigned for decades as the most flexible, highly traded, and widely used of all listed interest rate derivatives.  Eurodollar Futures prices reflect market expectations for interest rates on three-month Eurodollar deposits for specific dates in the future.  Eurodollar Futures at CME Group are priced based on the three month ICE LIBOR underlying rate and listed under the March quarterly cycle for 40 consecutive quarters, plus four serial contracts at the front end of the curve.  Eurodollar Futures are financially settled products, and expire on the second business day that precedes the third Wednesday of each contract month, which is usually a Monday.

## D.     The Mechanics of Spoofing

38.      "Spoofing" is a manipulative trading device used to create artificial prices in futures markets.  Specifically, the practice entails:  (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity; (b) submitting or cancelling bids or offers to delay another person's execution of trades; (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth; or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[3]

39.     Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices.  For example, if a trader wants to spoof prices lower, he will

---

[2] Eurodollars should not be confused with the currency of the European Union which is known as the Euro.

[3] CFTC, Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

place an order (this could also be called a "Primary Order"), often in the form of an iceberg order, to buy futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than where any market participant would be willing to sell. The trader will then place one or more large orders—orders the trader never intends to execute—to *sell* a substantial amount of the same contract on the opposite side of the market. These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled. These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order. The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

40. FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book. The best bid is two ticks away from the best offer and, therefore, no executable trades are present. For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid. FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg buy order is placed to buy 200 contracts, but only showing 12 contracts to the market at a time. Then, spoof orders are placed on the opposite side of the market: one order, placed with an order splitter, for 200 contracts is placed at the first offer level; an additional order for 100 contracts is also placed at the first offer level; and a third order for 250 contracts is placed, using an order splitter, at the second offer level. Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 105.5 | | | 15 | 187 |
| 104.5 | | | 8 | 94 |
| 104 | | | 12 | 144 |
| 103.5 | | | 14 | 269 |
| 103 | | | 6 | 87 |
| 102.5 | | | 11 | 124 |
| 101.5 | | | 10 | 356 |
| 101 | | | 11 | 243 |
| 100.5 | | | 19 | 312 |
| 100 | | | 15 | 428 |
| | | | | |
| 99 | 16 | 345 | | |
| 98.5 | 19 | 253 | | |
| 98 | 9 | 264 | | |
| 97.5 | 13 | 192 | | |
| 97 | 12 | 350 | | |
| 96.5 | 8 | 241 | | |
| 95.5 | 6 | 165 | | |
| 95 | 9 | 110 | | |
| 94 | 12 | 212 | | |
| 94.5 | 15 | 132 | | |
| **TOTAL**: | 119 | 2264 | 121 | 2244 |

Order Book Before the Spoofing Begins

FIGURE 2a.



FIGURE 2b.

41. The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

42. In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price or to sell futures contracts at above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad actors

seeking to manipulate the market through the abuse of technology."[4]  James McDonald, CFTC's Director of Enforcement, has remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[5]

43.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims.  And, as alleged here, Defendants' use of spoofing harmed Plaintiff and the Class members who purchased or sold Treasury and/or Eurodollar Futures at artificial prices during the Class Period.

## II.     Defendants' Manipulation of Treasury and Eurodollar Futures

44.     During the Class Period, Deutsche Bank engaged in the proprietary trading of futures contracts on the CME a designated contract market located in the United States.

45.     During the Class Period, Defendants traded interest rate futures contracts, including, but not limited to, Treasury and Eurodollar Futures.  Defendants were one of the largest futures trading firms in the world.  In 2013, Deutsche Bank had approximately $72 trillion (€55.6

---

[4] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[5] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (Nov. 14, 2018), *available at*:  https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918  (last accessed Apr. 29, 2020).

trillion) in exposure to derivatives, $5.95 trillion (€4.35 trillion) of which were exchange traded interest rate derivatives, which include futures on Eurodollars and Treasuries.[6]

46.     Throughout the Class Period, Defendants spoofed the Treasury and Eurodollar Futures market to illegally increase their trading profits, at the expense of Plaintiff and the Class. By submitting and then withdrawing Deceptive Orders, Defendants were able to manipulate the Treasury and Eurodollars Futures markets.

47.     According to the CFTC Order, Defendants' traders manually placed bids or offers on the CME with the intent to cancel bids or offers before execution. The Traders placed Spoof Orders to induce other market participants to fill the traders' Primary Orders on the opposite side of the market.

48.     Specifically, a Deutsche Bank trader identified in the CFTC Order as "Trader A" would trade from Tokyo during the overnight United States trading hours, when volume and volatility were comparably low relative to daytime hours. Trader A would frequently manually place primary Treasury futures contracts at or near the best price while simultaneously also placing and canceling much larger Spoof Orders on the opposite side of the market or in correlated markets, such as other Treasury Future contract tenors, in order to have the primary orders filled at favorable prices. The CFTC Order provided the following representative example of Trader A's manipulative trading:

> For example, Trader A placed a Genuine Order for Treasury futures contracts at the best price. At or near the same time, Trader A also placed and canceled a much larger Spoof Order on the opposite side of the same market or in a correlated market

---

[6]     *See* Deutsche Bank 2013 Annual Report at 101, https://annualreport.deutsche-bank.com/2013/ar/servicepages/downloads/files/dbfy2013_entire.pdf; *see also* Mike Bird, *Understanding Deutsche Bank's $47 Trillion Derivatives Book*, WALL STREET JOURNAL (October 5, 2016) https://www.wsj.com/articles/does-deutsche-bank-have-a-47-trillion-derivatives-problem-1475689629.

for a different tenor of Treasury futures contracts.[7] Trader A spoofed primarily during New York overnight hours, when trading volume and volatility were substantially decreased. Thus, Trader A's Spoof Orders would have a larger impact on the balance of bids and offers visible in the electronic order book, and Trader A could expose the Spoof Orders for a longer period of time without execution than would be possible during the more active daytime sessions.

49. Similarly, a Deutsche Bank trader identified in the CFTC Order as "Trader B" also traded from Tokyo during the overnight United States trading hours. Trader B would frequently manually place primary Treasury and Eurodollar Futures contracts at or near the best price while simultaneously also placing and canceling much larger (often twenty times larger) Spoof Orders on the opposite side of the market or in correlated markets, such as other Eurodollar Future contract tenors, in order to have the primary orders filled at favorable prices. The CFTC Order provided the following representative example of Trader B's manipulative trading:

> For example, at or near the time Trader B placed a Genuine Order, Trader B placed and canceled a much larger Spoof Order— often twenty times larger than the Genuine Order – on the opposite side of the Genuine Order in either the same futures contract, or in a correlated market for a different tenor of a Eurodollar futures contract, or in one tenor of the Eurodollar pack or bundle[8] constituting the Genuine Order. Trader B also spoofed primarily during New York overnight hours, when trading volume and volatility were substantially decreased. Thus, Trader B's Spoof Orders would have a larger impact on the balance of bids and offers visible in the electronic order book, and Trader B could expose the Spoof Orders for a longer period of time without execution than would be possible during the more active daytime sessions.

50. Market participants traded in what appeared to be a legitimate change in supply or demand. Thus, Defendants' Deceptive Orders caused market participants to enter sell orders below, or buy orders above, the prevailing market price as a result of the manipulation. Likewise,

---

[7] 2 Because of the term structure of interest rates, a price movement in one tenor of the Treasury futures market can cause a corresponding price movement in another tenor of the Treasury futures market.

[8] A Eurodollar pack or bundle is an aggregation of multiple tenors of Eurodollar futures contracts in equal proportions traded simultaneously. They create or liquidate positions along a particular segment of the yield curve in a single transaction.

other market participants kept positions below or above what would otherwise have been the prevailing market price and quantity.

51. After entering the Deceptive Orders, Defendants then cancelled the Deceptive Orders. Simultaneously or soon thereafter, Defendants entered orders on the same instrument on the opposite side of the Deceptive Order. This allowed Defendants to buy or sell Treasury and Eurodollar instruments from/to other market participants at artificially higher or lower prices than would have existed if not for the Deceptive Orders.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated. The "Class" is defined as:

> All persons or entities who transacted in Treasury and/or Eurodollar Futures or options on Treasury and/or Eurodollar Futures traded on a domestic exchange during the period January 1, 2013 to December 31, 2013 (the "Class Period").

53. Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

54. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury or Eurodollar Futures and Options on Treasury or Eurodollar Futures during the Class Period at prices artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

55. Plaintiff's claims are typical of the claims of other Class members. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein. No conflict between Plaintiff and the Class members exists.

56. Plaintiff will fairly and adequately protect the Class's interests. Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

57. The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members, include, but are not limited to:

a.  whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury and Eurodollar Futures prices;

b.  the nature and duration of Defendants' manipulation of Treasury and Eurodollar Futures prices;

c.  whether manipulation of Treasury or Eurodollar cash prices injected artificial prices into Futures that traded on the CME and/or CBOT;

d.  whether Defendants participated in the Treasury and Eurodollar Futures markets;

e.  whether Defendants' conduct violated Section 22 of the CEA;

f.  whether Defendants' conduct acted to aid and abet CEA violations;

g.      whether Defendants fraudulently concealed their misconduct from Plaintiff and the

Class; and

h.      the appropriate class-wide measure of relief for the Defendants' CEA violations.

58.     Class action treatment is a superior method for the fair and efficient adjudication of

the controversy, in that, among other things, such treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently

and without the unnecessary duplication of evidence, effort, and expense that numerous individual

actions would engender.   The benefits of proceeding through the class mechanism, including

providing injured persons or entities with a method for obtaining redress for claims that might not

be practicable to pursue individually, substantially outweigh any difficulties that may arise in

management of this class action.

59.     The prosecution of separate actions by individual Class members would create a

risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

Defendants.

60.     Plaintiff is unaware of any difficulties that are likely to be encountered in the

management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

61.     During the Class Period, Defendants actively, fraudulently and effectively

concealed their collusion and manipulation of the Treasury and Eurodollar Futures market.

62.     Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy

or sell Treasury and Eurodollar Futures at a certain price, even though they secretly had no intent

of transacting at that level.   Never did Defendants disclose that they placed these orders to

manipulate the prices of those instruments.  Because of such fraudulent concealment, and the fact

that Defendants' manipulation is inherently self-concealing, Plaintiff and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

63.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before June 18, 2020, when the CFTC announced sanctions against Defendants for spoofing the Eurodollar and Treasury Futures markets during 2013.

64.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and the Class.

65.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Treasury and Eurodollar Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.* and Regulation 180.2)**
**(Against All Defendants)**

66.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

67.     During the Class Period Defendants intended to and did cause unlawful and artificial prices of Treasury and Eurodollar Futures in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

68.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

69.     During the Class Period, Treasury and Eurodollar Futures' prices did not result from the legitimate market information and the forces of supply and demand.  Instead, Treasury

and Eurodollar Futures' prices were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

70.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Treasury and/or Eurodollar Futures.

71.     Defendants manipulated Treasury and Eurodollar Futures' prices throughout the Class Period, and thereby caused damages to Plaintiff and Class members who purchased or sold at these artificially inflated or deflated prices.

72.     Defendants had the ability to cause and did cause artificial prices of Treasury and Eurodollar Futures.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Treasury and Eurodollar Futures and were aware of the effects of spoofing on those markets.

73.     Defendants' ability and intent to cause artificial prices was enhanced through their trading overnight hours during lighter trading and less volatility, while having avoiding having those Spoof Orders filled.

74.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

75.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury and/or Eurodollar Futures, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

23

76. Plaintiff and the Class are each entitled to actual damages sustained in Treasury and/or Eurodollar Futures for the CEA violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device In**
**Violation of the Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**(Against All Defendants)**

77. Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

78. Defendants' unlawful conduct, including the use of submitting and cancelling Spoof Orders and engaging in other manipulative conduct in order to artificially move prices for Treasury and Eurodollar Futures, constitutes the employment of a manipulative and deceptive device.

79. Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class. The risk that the Defendants' Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by the Defendants' Spoof Orders was so obvious that the Defendants must have been aware of it.

80. Defendants knew that their Spoof Orders would appear in the Order Book and that traders often consider Order Book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their Spoof Orders would mislead other market participants.

81. Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

82.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury and/or Eurodollar Futures contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

83.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**Vicarious Liability in Violation of the**
**Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, *et seq.*)**
**(Against All Defendants)**

84.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

85.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

86.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants)**

87.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

88.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted Spoof Orders to the CME and CBOT and employed other techniques to manipulate the prices of Treasury and Eurodollar Futures in an artificial direction.  Defendants

25

intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiff's and the Class's expense.

89.     It would be inequitable for Defendants to be allowed to retain the benefits, which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiff's and the Class's expense.

90.     Plaintiff and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

91.     In addition, each Defendant should pay restitution of its own unjust enrichment to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and their counsel as Class Counsel;

(B)     For a judgment awarding Plaintiff and the Class actual damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(D)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

Dated: June 29, 2020

CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP

  /s/ Anthony F. Fata
Anthony F. Fata
Jennifer W. Sprengel
Brian P. O'Connell
Kaitlin Naughton
150 S. Wacker
Suite 3000
Chicago, IL 60606
Tel.: 312-782-4882
Email: afata@caffertyclobes.com
jsprengel@caffertyclobes.com
boconnell@caffertyclobes.com
knaughton@caffertyclobes.com

*Liaison Counsel for Plaintiff and
the Proposed Class*

KIRBY MCINERNEY LLP
David E. Kovel
Karen M. Lerner
Anthony E. Maneiro
250 Park Avenue
Suite 820
Tel.: (212) 371-6600
Email: dkovel@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

*Counsel for Plaintiff and the Proposed Class*